**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| ELLISSA D. SCOTT,<br>Plaintiff,<br>vs.<br>COMMISSIONER OF SOCIAL SECURITY,<br>Defendant. | CASE NO. 4:25-CV-01252-AMK<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Elissa D. Scott seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF Doc. 7.) For the reasons set forth below, the Court **AFFIRMS** the Commissioner's final decision.

## I. Procedural History

On March 14, 2023, Ms. Scott filed an application for DIB, alleging disability beginning May 1, 2021. (Tr. 63.) She alleged disability due to attention deficit hyperactivity disorder ("ADHD"), anxiety, celiac disease, major depressive disorder ("MDD"), nerve pain, sinustitis, neuropathy, Type 1 diabetes mellitus, hyperthyroidism, migraine, premenstrual tension syndrome, high blood pressure, and gastroesophageal reflux disease ("GERD"). (Tr. 64, 74.) Her application was denied at the initial level (*id.*) and upon reconsideration (Tr. 73). She then requested a hearing. (Tr. 107.)

On July 2, 2024, a hearing was held before an Administrative Law Judge ("ALJ"). (Tr. 35-62.) On July 11, 2024, the ALJ issued a decision finding that Ms. Scott had not been under a disability from May 1, 2021, through the date of the decision. (Tr. 14-34.) Ms. Scott requested review of the decision by the Appeals Council, and her request for review was denied on May 8, 2025, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-6.)

Ms. Scott filed the Complaint on June 16, 2025 (ECF Doc. 1), raising the following assignment of error:

> The RFC is not supported by substantial evidence because the ALJ failed to reconcile its conflict with Dr. Murry-Hoffman's and Dr. Richardson's opinions.

(ECF Doc. 10, p. 1.) The matter is fully briefed and ripe for decision. (ECF Docs. 10, 12, 13.)

## II. Evidence

### A. Personal, Educational, and Vocational Evidence

Ms. Scott was born in 1968 and was 52 years old on the alleged disability onset date, making her an individual closely approaching advanced age under Social Security regulations on the alleged onset date. (Tr. 64.) She had at least a high school education. (Tr. 226.) She has not worked since May 1, 2021, the alleged onset date. (Tr. 64.)

### B. Medical Evidence

#### 1. Relevant Treatment History[1]

On May 3, 2021, Ms. Scott attended a routine appointment with her primary care provider, Scott Agnew, M.D., at Southwoods Physicians Services to address, among other conditions, ADHD and depression. (Tr. 504-07.) She reported anxiety, but also that she was "doing pretty well emotionally" and that Ritalin helped her concentrate. (Tr. 506.) On

[1] While the ALJ found severe physical and mental health impairments (Tr. 19-20), Ms. Scott's arguments are based on her mental RFC, specifically her ability to interact with others (ECF Doc. 10). The Court's summary is generally limited to the evidence cited in the parties' briefs that is relevant to the legal and factual issues before the Court.

examination, she was cooperative and fully oriented, appeared healthy, comfortable, and well-groomed, and her mental status was grossly normal, with congruent mood, good judgment and insight, and normal affect, speech, thought process, and thought content. (Tr. 506-07.)

At a follow-up appointment with Dr. Agnew on August 3, 2021, Ms. Scott continued to report that Ritalin helped her concentrate, but it caused elevated heart rate at times. (Tr. 502.) No mental status examination was conducted. (Tr. 500-03.) At a November 4, 2021 follow up, Ms. Scott felt more depressed and sat around, not wanting to do anything. (Tr. 497.) Her mental status examination was unchanged from the May appointment. (Tr. 497-98.)

On May 31, 2022, Ms. Scott returned to see Dr. Agnew and reported feeling equal amounts depressed and anxious. (Tr. 492.) Her daughter and son had attempted suicide. (*Id.*) Her mental status examination was unchanged from previous appointments. (Tr. 492-93.) Ms. Scott was taking fluoxetine for depression, but Dr. Agnew switched it to cariprazine (Vraylar) and referred Ms. Scott to psychology. (Tr. 494.) When the Vrayler was later denied by insurance, Dr. Agnew prescribed venlafaxine. (Tr. 487.)

At an August 23, 2022 follow-up with Dr. Agnew, Ms. Scott reported that life had been very stressful, and she felt anxious and depressed, but she denied suicidal ideation. (*Id.*) On examination, her mental status was grossly normal, with congruent mood, sad affect, good insight and judgment, and normal speech, thought process, and thought content. (Tr. 488.) Dr. Agnew discontinued venlafaxine due to an adverse reaction and prescribed fluoxetine. (Tr. 489.)

Ms. Scott returned to see Dr. Agnew on November 16, 2022. (Tr. 479-83.) She had seen a counselor, but “Comp Psych” would not see her. (Tr. 481.) She reported having had some suicidal thoughts but was confident she would not commit suicide. (*Id.*) A mental status

examination was normal. (Tr. 482.) Dr. Agnew discontinued fluoxetine, prescribed vortioxetine, and referred Ms. Scott to psychiatry. (Tr. 483.)

On December 6, 2022, Ms. Scott underwent a diagnostic evaluation with Melanie Olsen, MS ED, LPCC, at Struthers PsyCare. (Tr. 573-81.) She reported anxiety, depression, and difficulty coping with stressors/problems. (Tr. 573.) She did not want to shower or get out of bed or off the couch (*id.*), she experienced some passive thoughts of not caring if she lived (Tr. 575), and she reported a history of sexual, physical, mental, and emotional abuse (Tr. 574, 576-577). On mental status examination, Ms. Scott: was alert, cooperative, and adequately groomed; gave relevant responses; comprehended questions asked; spoke with adequate articulation and normal rate and volume; and displayed average intelligence, racing thoughts, normal abstract reasoning, mostly logical thought content, fair insight and judgment, and moderately anxious and depressed mood with congruent affect. (Tr. 574.)

Ms. Scott attended a counseling session with LPCC Olsen on December 27, 2022. (Tr. 582-85.) She reported several family life stressors. (Tr. 582.) A mental status examination showed: adequate grooming; alert, cooperative, and appropriate behavior; adequate articulation; normal speech rate/volume; moderately depressed and anxious mood; consistent affect; and relevant, coherent, and generally logical thought processes. (Tr. 583.)

Ms. Scott attended further counseling sessions on January 3 and January 17, 2023. (Tr. 586-90, 597-601.) Her mental status examination remained unchanged from her initial session, except that she displayed some maladaptive thought patterns. (Tr. 587, 598.)

On January 18, 2023, Ms. Scott presented to Katie Spickler, MSN, PMHNP-BC, at Struthers PsyCare for a diagnostic evaluation of her mental health symptoms. (Tr. 602-06.) She reported constant anxiety, poor sleep, fatigue, irritability, hopelessness, shortness of breath, heart

palpitations, decreased appetite, worsening depression, and mood instability. (Tr. 603.) A mental status examination showed: adequate grooming and appropriate hygiene; moderately depressed, mildly anxious, and moderately irritable mood with congruent affect; normal speech; poor eye contact; restless, guarded, and evasive behavior; mildly impaired attention and concentration; full orientation; intact memory; average intelligence; and fair insight and judgment. (Tr. 605.) MSN Spickler diagnosed GAD and MDD, recurrent, moderate and prescribed Trintellix and hydroxyzine. (Tr. 606.)

Ms. Scott continued with psychiatric care and counseling at Struthers PsyCare through August 2023. (Tr. 677-749.) MSN Stickler adjusted Ms. Scott's medication as needed. In February, she prescribed Lexapro instead of Trintellix, as the latter was not effective. (Tr. 611.) In April 2023, she increased Lexapro to treat depressive symptoms and added sleeping pills. (Tr. 87.) At the end of August, she substituted Cymbalta for Lexapro and added Ambien. (Tr. 743.)

During her eight months at Struthers PsyCare, Ms. Scott consistently reported depressive symptoms, anxiety, and strained relationships with her children and other family members. (*See* Tr. 597, 610, 679, 694.) On multiple occasions, she reported agoraphobia or difficulty leaving the house. (Tr. 610, 694, 703, 740.) In April, she said her psychotropic medications seemed to be working (Tr. 679), and in June, she reported that her depressive symptoms had improved (Tr. 720). In her mental status examinations, she consistently displayed adequate grooming, normal speech, and appropriate behavior. (*See, e.g.,* Tr. 680, 690, 695, 700, 702, 707, 712, 719, 724, 734, 741-42, 746.) While at times her mood and thought content were normal (Tr. 680, 700, 719), she more often exhibited mildly or moderately depressed and anxious mood with consistent affect and relevant, coherent, but maladaptive and/or helpless/dependent thought patterns. (*See*

Tr. 680, 686, 690, 695, 702, 706, 712, 724, 734, 746.) At times she also displayed mildly impaired attention and concentration. (Tr. 686, 702, 719.)

Treatment records for non-psychological visits in the record reflect that Ms. Scott often displayed full orientation, normal movement, normal mood and affect, no behavioral problems, no anxiety, and/or fair insight and judgment. (*See, e.g.*, Tr. 312, 318, 324, 329, 333-34, 337, 758, 764, 822). At some appointments with her primary care physician in 2023, she continued to report symptoms of depression. (*See* Tr. 476 (2/16/2023) (indicating that Ms. Scott reported feeling depressed); Tr. 666 (7/27/2023) (noting that Ms. Scott reported she was not crying as much as before, but she felt "emotionally dead," had brain fog, and forgot names).)

### 2. Opinion Evidence

On May 24, 2023, state agency psychological consultant, Robyn Murry-Hoffman, PSY D., conducted a mental Residual Functional Capacity ("RFC") assessment. (Tr. 69-71.) She opined that Ms. Scott could perform simple two to four step tasks in a routine work environment that did not require high production rates or rapid time demands and was limited to occasional and superficial interpersonal contact and no more than incidental contact with the public. (Tr. 70.) On September 30, 2023, on reconsideration, state agency psychological consultant, Deryck Richardson, PHD, affirmed Dr. Murry-Hoffman's mental RFC findings. (Tr. 80-81.)

## C. Hearing Testimony

At the hearing on July 7, 2024, Plaintiff testified in response to questions from her attorney and the ALJ. (Tr. 42-54.) A Vocational Expert ("VE") testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination could perform representative positions in the national economy, including order picker, janitor, and laundry worker. (Tr. 57-58.)

## III. Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform other work available in the national economy. *Id.*

## IV. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"

*Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B. Sole Assignment of Error: The ALJ Did Not Fail to Reconcile a Conflict Between the State Agency Psychological Opinions and the Mental RFC**

In her sole assignment of error, Ms. Scott asserts that the ALJ erred when he adopted a mental RFC that limited Ms. Scott to "occasional interaction with others" without explaining why he did not also limit her to "superficial" interaction, when the state agency psychological opinions had found her capable of "occasional and superficial interpersonal contact." (ECF Doc. 10, pp. 10-14.) Arguing that the terms "superficial" and "occasional" are not interchangeable, Ms. Scott asserts that the ALJ failed to build a logical bridge between the evidence and the result

when he adopted an RFC limiting her to "occasional interaction" without explaining why he did not also limit her to "superficial" interaction. (*Id.* at pp. 11-13.)

In response, the Commissioner argues that the ALJ: was not required to adopt the state agency opinion findings verbatim; found the state agency opinions only "partially persuasive"; and adequately accounted for a limitation to "superficial" interaction when he adopted an RFC that excluded "tasks involving arbitration, negotiation, confrontation, directing the work of, or bearing responsibility for the safety or welfare of, others." (ECF Doc. 12 pp. 7-8; *see* Tr. 23.) Ms. Scott asserts that the Commissioner's third argument must fail because the ALJ did not explain that he interpreted "superficial" to mean "no tasks involving arbitration, negotiation, confrontation, directing the work of, or bearing responsibility for the safety or welfare of, others," and therefore failed "to provide an explanation or some type of logical bridge for the RFC determination[.]" (ECF Doc. 13, pp. 1-2.)[2]

"The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)). Therefore, an ALJ is "not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding." *Id*. Indeed, even where an opinion was given great weight under earlier regulations, the Sixth Circuit found "there [was] no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor [was] the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). Nevertheless, where an RFC "conflicts with

[2] Plaintiff also asserts for the first time in her reply brief that the RFC "was contradicted by the record of evidence" (ECF Doc. 13, p. 2) and the ALJ engaged in "cherry-picking" the evidence (*id.* at p. 3). These arguments, which were raised for the first time in a reply brief, are deemed waived. *Stewart v. IHT Ins. Agency Grp., LLC*, 990 F.3d 455, 457 (6th Cir. 2021) ("[E]ven well-developed arguments raised for the first time in a reply brief come too late."). Moreover, Plaintiff primarily cites to her own subjective reports to providers (ECF Doc. 13, pp. 2-3) but has not challenged the ALJ's finding that "the intensity, persistence and limiting effects of" her subjective complaints "are not entirely consistent with the medical evidence and other evidence in the record" (Tr. 26) in this appeal.

an opinion from a medical source," Social Security Ruling ("SSR") 96-8p requires the ALJ to "explain why the opinion was not adopted." SSR 96-8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34478 (July 2, 1996).

Here, the state agency psychological consultants opined that Ms. Scott had the following "social interaction limitations":

> [Claimant] is limited to occasional and superficial interpersonal contact and tasks that do not require contact with the public. Incidental public contact will not be a problem.

(Tr. 70, 80 (emphasis added).) The ALJ then adopted a mental RFC finding Ms. Scott able to perform certain tasks in a setting that:

> requires no more than occasional interaction with others but imposes no tasks involving arbitration, negotiation, confrontation, directing the work of, or bearing responsibility for the safety or welfare of, others and no more than incidental interaction with the public[.]

(Tr. 23.) In support of the RFC, the ALJ generally discussed Ms. Scott's: diagnoses of MDD, GAD, and ADHD; regimen of psychotropic medications, which were generally helpful and caused minimal if any side effects; counseling records documenting "a steady, if mild degree of progress"; mental status findings that "consistently, albeit not universally" showed "mildly adverse or benign findings"; reported symptoms of difficulty getting along with others and leaving her home; and reported activities such as caring for her grandchildren. (Tr. 23, 25-26.) The ALJ then analyzed the state agency opinions regarding social limitations as follows:

> The state agency psychological consultants, Robyn Murry-Hoffman, Psy.D., and Deryck Richardson, Ph.D., each indicated that the claimant would be able to perform simple, two-to-four-step tasks in a routine setting with no high production rate or rapid time demands, involving <u>occasional and superficial interaction with co-workers and supervisors and no more than incidental interaction with the public</u>. Each of these doctors had the opportunity to review the evidence of record, to which each cited liberally in support of their conclusions, and each is well versed in the terminology and analytical framework employed in the disposition of these claims. The record shows a claimant with chronic psychological disorders. . . . The claimant has described difficulties with community "others" []. She is often described in the

> treatment records as with a sad mood [], or as evasive and crying [], which may be off-putting. However, her legal history is insignificant for violence []. She has named friends to serve as the third-party contact for this claim []. She is discernibly able to function in public settings, such as stores [], dances [], racetrack resorts [], and while helping to host a garage sale []. Generally, the treatment notes describe her in pro-social form: as very pleasant [], as cooperative, with a normal affect [], or as calm and pleasant []. Provided the frequency, and potential for escalation in the emotional intensity, of her interaction with others is controlled, the evidence shows the claimant has retained sufficient, residual, social function to engage in competitive work. . . . <u>These opinions overstate, to mild degree, the claimant's social limitations with regard to the public</u>. . . . <u>Still, these opinions are partially consistent with, and supported by, the overall evidence of record and are partially persuasive</u>.

(Tr. 27-28 (citations omitted) (emphasis added).)

Citing SSR 96-8p and unpublished district court decisions, Ms. Scott argues that "the ALJ was required to provide an explanation for accepting the opined co-worker and supervisor interaction limitation in its entirety but not incorporating the superficial element of the RFC determination," and failed to do so. (ECF Doc. 10, p. 13.) But in order to find error under SSR 96-8p based on a lack of explanation, this Court must first find there is a "conflict" between the opinions limiting Plaintiff to "occasional and superficial interpersonal contact" and the RFC that limited her to settings that "require[] no more than occasional interaction with others but impose[] no tasks involving arbitration, negotiation, confrontation, directing the work of, or bearing responsibility for the safety or welfare of, others." *See* 61 Fed. Reg. at 34478. Only if there was a conflict between the state agency limitation to "superficial interpersonal contact" and the RFC limitation to "no tasks involving arbitration, negotiation, confrontation, directing the work of, or bearing responsibility for the safety or welfare of, others" was the ALJ required to "explain why the [state agency] opinion[s] w[ere] not adopted" under SSR 96-8p. *Id.*

Focusing on that issue, the Commissioner asserts that "the ALJ did in fact include a limitation to account for the State agency consultants' limitation to superficial interaction" when

he "limited Plaintiff to tasks that do not entail 'arbitration, negotiation, confrontation, directing the work of, or bearing responsibility for the safety or welfare of[] others.'" (ECF Doc. 12, p. 17 (citing Tr. 23) (brackets in brief).) In other words, the Commissioner argues there was no "conflict" requiring explanation under SSR 96-8p because the social limitations adopted by the ALJ in the RFC are consistent with a limitation to "superficial" interaction. The Court agrees.

While Plaintiff cites unpublished cases that discuss potential characterizations of the term "superficial" (ECF Doc. 10, pp. 11-12), the undersigned has explained that "superficial" is not a defined term in the Dictionary of Occupational Titles ("DOT"), the Selected Characteristics of Occupations ("SCO"), or the governing regulations. *See, e.g., Lopez v. Comm'r of Soc. Sec.*, No. 1:22-CV-01801, 2024 WL 1580101, at *19 (N.D. Ohio Apr. 11, 2024) (collecting cases). The Standard Occupational Classification system ("SOC") also does not define "superficial." *See Standard Occupational Classification Manual*, Office of Management and Budget (2018) https://www.bls.gov/soc/2018/soc_2018_manual.pdf, accessed 8/31/2026. A review of standard dictionary definitions also fails to clarify what work-related interactions should be considered "superficial" in a vocational context. *See Lopez*, 2024 WL 1580101, at *19 (quoting *Merriam-Webster's Unabridged Dictionary*, Merriam-Webster, https://unabridged.merriam-webster.com/unabridged/superficial). The lack of a defined vocational meaning for the term is notable because SSA guidance provides that VE testimony should be based on a "reliable source of occupational information that is commonly used by vocational professionals and is relevant under [SSA] rules," such as the DOT or the SOC. *See* SSR 24-3p, *Use of Occupational Information and Vocational Specialist and Vocational Expert Evidence in Disability Determinations and Decisions*, 89 Fed. Reg. 97158, 97159 (Jan. 6, 2025). And ALJs are instructed in their internal manual to direct VEs "not to respond to questions on medical matters

or draw conclusions outside the VE's expertise on vocational issues." HALLEX I-2-6-74(D)(2). Considering this authority, the Court concludes that "it was appropriate for the ALJ to specifically identify the assumptions the VE should make in defining the term 'superficial' for purposes of the RFC." *Lopez*, 2024 WL 1580101, at *20.

Here, the ALJ acknowledged that the state agency consultants limited Ms. Scott to "occasional and superficial interaction with co-workers and supervisors and no more than incidental interaction with the public," before finding the "opinions overstate[d], to mild degree, the claimant's social limitations with regard to the public" but were "partially consistent with, and supported by, the overall evidence of record[.]" (Tr. 27-28.) He then adopted an RFC that limited Ms. Scott to "occasional interaction with others" with "no tasks involving arbitration, negotiation, confrontation, directing the work of, or bearing responsibility for the safety or welfare of, others and no more than incidental interaction with the public." (Tr. 23.) The ALJ's analysis does not suggest he rejected or found a conflict between "superficial interaction" and his own, more specific, limitation to "no tasks involving arbitration, negotiation, confrontation, directing the work of, or bearing responsibility for the safety or welfare of, others." (*Id.*)

Considering there is no vocational definition of the term "superficial interaction," the Court does not find a conflict between a general limitation to "superficial interaction" and a more specific limitation precluding arbitration, negotiation, confrontation, and directing or being responsible for others. Indeed, numerous courts have found similar limitations consistent with the term "superficial interaction." *See, e.g., Harcula v. Comm'r of Soc. Sec.*, No. 1:22-CV-01950-CEF, 2023 WL 6050291, at *15 (N.D. Ohio Aug. 31, 2023) (upholding an RFC that defined "superficial interaction" as "no arbitration, mediation, negotiation, confrontation, or being responsible for the safety or supervision of others."), *report and recommendation adopted,*

2023 WL 6049326 (N.D. Ohio Sept. 15, 2023); *Betz v. Comm'r of Soc. Sec.*, No. 3:21-CV-2408, 2022 WL 17717496, at *11 (N.D. Ohio Nov. 8, 2022) (upholding an RFC that defined "superficial contact" as "no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others or being responsible for the safety or welfare of others"), *report and recommendation adopted*, No. 3:21 CV 2408, 2022 WL 17985680 (N.D. Ohio Dec. 29, 2022); *Lopez*, 2024 WL 1580101, at *19-20 (upholding an RFC that defined "superficial interaction" as "work that does not involve any work tasks, such as arbitration, negotiation, confrontation, being responsible for the safety of others, or directing the work of others").

Ms. Scott's citation to unpublished district court decisions concluding that "superficial" interaction refers to the "quality" of an interaction (while "occasional" refers to the "quantity"), does not alter this analysis. (*See* ECF Doc. 10, pp. 11-12 (citations omitted).) Even if that characterization of the term "superficial" were binding on the ALJ and this Court, the types of interactions precluded by RFC in this case were clearly selected based on the nature (or "quality") of the described interactions, not simply based on the quantity of time spent.

For the reasons explained above, the Court concludes that there was no "conflict" between the state agency opinions limiting Ms. Scott to "occasional and superficial interpersonal contact" and the RFC. There was accordingly no requirement under SSR 96-8p that the ALJ explain why he did not adopt the opined limitation to "superficial" interaction.

Ms. Scott's more general argument that the ALJ failed to "provide an explanation or some type of logical bridge between his RFC determination and the opinion analysis" must also fail. (ECF Doc. 10, p. 13.) As discussed at some length above, the ALJ discussed Ms. Scott's subjective complaints and the findings in her medical records (Tr. 23, 25-26), acknowledged the specific language in the state agency opinions (Tr. 27), identified specific subjective reports,

objective findings, and activities that the ALJ found "shows the claimant has retained sufficient, residual, social function to engage in competitive work" (Tr. 28), and held that the state agency opinions "overstate[d], to mild degree, the claimant's social limitations with regard to the public" but were "partially consistent with, and supported by, the overall evidence of record" (*id.*). The ALJ then adopted a mental RFC that limited both the "quantity" and the "quality" of the interactions in which Ms. Scott might be required to participate. (Tr. 23.) The RFC limitations adopted by the ALJ in place of the undefined term "superficial interaction" are consistent with limitations adopted by other ALJs for the same purpose. *See, e.g., Harcula*, 2023 WL 6050291, at *15; *Betz*, 2022 WL 17717496, at *11; *Lopez*, 2024 WL 1580101, at *19-20. The Court therefore concludes that the ALJ's analysis was sufficient for Court to conduct a meaningful review of his reasoning and built a logical bridge between the evidence and the result.

For the reasons set forth above, the Court concludes that the ALJ complied with the requirements of SSR 96-8p and adopted a mental RFC that was sufficiently explained and supported by substantial evidence. Plaintiff certainly has not met her burden to demonstrate otherwise. Accordingly, the Court finds Ms. Scott's sole assignment of error lacks merit.

## V. Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's final decision.

August 31, 2026

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge